STATE OF NORTH CAROLINA v. MICHAEL SCOTT LYNN

No. COA02-382

(Filed 15 April 2003)

**1. Discovery— medical records—State's witness—request that State investigate**

An attempted murder defendant's right to due process was not violated by the denial of his motion to require the State to investigate to learn the identities of any mental health professionals from whom an accomplice (and State's witness) had sought treatment. The motion did not suggest that the witness's ability to observe and to testify to events was impaired by a mental defect or by any medication used to treat a mental illness; defendant did not allege that information about the witness's mental health was in the possession of the State; and the denial of the motion did not prevent defendant from exploring the issue at trial.

**2. Discovery— sealed medical records—in camera review—no exculpatory evidence**

The trial court correctly ruled that the sealed medical records of a witness did not contain exculpatory evidence, even though the court said that certain medical terms were hard to understand. The court did not say that the records were incomprehensible, as defendant contended, and defendant did not preserve that issue for appeal. Moreover, the Court of Appeals conducted an independent review of the records.

**3. Evidence— hearsay—statements to nontestifying officer—related by another officer**

Inconsistent statements from an attempted murder victim were properly excluded where they were made to an officer who did not testify and elicited at trial during the cross-examination of an SBI agent. Inconsistent statements must be proven by direct evidence. Moreover, defendant did not move at trial to admit the officer's notes under the public records and reports exception to the hearsay rule, and there was no reasonable possibility of a different result if the statement had been admitted.

Appeal by defendant from judgment entered 27 January 1999 by Judge Stafford G. Bullock in Wake County Superior Court. Heard in the Court of Appeals 30 October 2002.

*Attorney General Roy Cooper, by Special Deputy Attorney General E. Burke Haywood, for the State.*

*Kurtz and Blum, P.L.L.C., by Seth A. Blum, for the defendant.*

LEVINSON, Judge.

Defendant, Michael Scott Lynn, appeals his convictions of conspiracy to commit first degree murder, attempted first degree murder, and assault with a deadly weapon with intent to kill. For the reasons that follow, we affirm.

The evidence tended to show, in relevant part, the following: In the fall of 1997, defendant was hired as a cook at the Garner, North Carolina, Waffle House restaurant. Sylvia Groves (Sylvia) was a supervisor at the restaurant. She was married to the victim in this case, David Groves (Groves). Sylvia introduced Groves to the defendant on at least one occasion, when Groves ate at the restaurant. After defendant was hired at the Waffle House, he and Sylvia became friends, and later began a romantic and sexual relationship. After about six months, Sylvia and defendant began to discuss "shooting Dave [Groves] to get [him] out of the way[.]" Sylvia testified that these conversations began "as a little joke" but then the two "planned to shoot him so he would not be there because [she] could not . . . leave [Groves]."

On 7 May 1998, defendant called in sick at work. Sylvia went to defendant's home and picked him up. At trial, defendant's mother testified that defendant returned home in about an hour. However, Sylvia testified that she and the defendant drove to her house, where defendant waited outside. Sylvia further testified that when they arrived at her house, she went in, retrieved a gun from the bedroom that she and Groves shared, and took it outside to defendant. The defendant waited until she signaled that Groves was asleep. Then he snuck into the house and shot Groves twice while he lay in bed. Groves awoke, shouted that defendant had shot him, and called 911. Sylvia testified that she gave false statements to the police on the night of the shooting, denying that she knew the assailant, whom she described as wearing red checked pants. Nonetheless, Sylvia was arrested that evening, and later pled guilty to conspiracy to commit murder, attempted first degree murder, and assault with a deadly weapon with the intent to kill inflicting serious injury.

Groves testified that on the night of 7 May 1998, while he was in bed, the defendant came into his bedroom and shot him several

STATE v. LYNN

[157 N.C. App. 217 (2003)]

times. He saw the defendant clearly because "the light hit him right across the face," and Groves saw "the profile that was so distinctive[.]" Groves recognized the defendant immediately, because he had met the defendant several times before the shooting. He ran out of the bedroom, shouting to Sylvia that "her cook" had shot him. When an ambulance arrived, Groves was taken to the hospital, where he was treated and released. On cross-examination, Groves was questioned about the description of the defendant he had given law enforcement officers the night of the shooting, and denied telling officers that his assailant had worn "checkered pants."

Greg and Brenda Kehle, the Groves' next door neighbors, testified that Sylvia called them after the shooting. Greg Kehle immediately went to the Groves' trailer to help. Before the ambulance arrived, Groves told Kehle that the defendant, whom Kehle and Groves had met several times, was the person who shot him. Other evidence indicated that the defendant's fingerprints were found on Groves' truck the day after the shooting.

[1] Defendant has presented three arguments on appeal, two of which concern Sylvia's medical records. The defendant argues first that the trial court committed reversible error when it denied his pretrial motion to require that the State learn the names of any mental health professionals who had treated Sylvia, so that defendant could subpoena their records for an *in camera* inspection by the trial court. The transcript of pretrial proceedings indicates that the defendant had filed a written motion, requesting that the court order the State to conduct an inquiry to determine who, if anyone, had previously treated Sylvia for emotional or psychological problems. However, the motion is not a part of the record. This omission violates N.C.R. App. P. 9(3)(i), which requires that the record on appeal include "copies of all . . . papers filed . . . which are necessary for an understanding of all errors assigned[.]" Our review of this issue is, therefore, based upon the statements of counsel and of the trial court as they appear in the transcript of pretrial proceedings.

In the pretrial hearing, defendant asked that the trial court order the State to determine the identities of any mental health professionals "who [were] treating her for whatever her psychological problems were[.]" He alleges that the court's denial of this motion denied his due process right to material exculpatory evidence. We disagree.

**STATE v. LYNN**

[157 N.C. App. 217 (2003)]

As a general rule, a criminal defendant is entitled to potentially exculpatory evidence:

'Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt, or to punishment, irrespective of the good faith or bad faith of the prosecution.'. . . The duty to disclose encompasses impeachment evidence as well as exculpatory evidence. Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'

*State v. Holadia*, 149 N.C. App. 248, 256-57, 561 S.E.2d 514, 520-21 (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963), and *United States v. Bagley*, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 490 (1985)), *disc. review denied*, 355 N.C. 497, 562 S.E.2d 432 (2002). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *State v. Thompson*, 139 N.C. App. 299, 306, 533 S.E.2d 834, 840 (2000) (quoting *Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494). Therefore, in determining whether the defendant's lack of access to particular evidence violated his right to due process, "the focus should be on the effect of the nondisclosure on the outcome of the trial, not on the impact of the undisclosed evidence on the defendant's ability to prepare for trial." *State v. Hunt*, 339 N.C. 622, 657, 457 S.E.2d 276, 296 (1994).

" 'Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule.' " *State v. Soyars*, 332 N.C. 47, 63, 418 S.E.2d 480, 490 (1992) (quoting *Bagley*, 473 U.S. at 676, 87 L. Ed. 2d at 490). *See also State v. McGill*, 141 N.C. App. 98, 102-03, 539 S.E.2d 351, 355-56 (2000) (" '[f]avorable' evidence includes . . . 'any evidence adversely affecting the credibility of the government's witnesses' ") (new trial required where defendant denied access to files "tend[ing] to show that [previous] false accusations were made against [defendant]") (quoting *United States v. Trevino*, 89 F.3d 187, 189 (4th Cir. 1996)).

Moreover, such impeachment evidence may include evidence that a witness suffers from a serious psychiatric or mental illness. The rationale behind allowing impeachment by evidence of prior treatment for psychiatric problems is that although "instances of . . . mental instability are not directly probative of truthfulness, they may bear upon credibility in other ways, such as to 'cast doubt upon the

capacity of a witness to observe, recollect, and recount[.]' " *State v. Williams*, 330 N.C. 711, 719, 412 S.E.2d 359, 364 (1992) (quoting 3 Federal Evidence § 305, at 236). *See State v. Newman*, 308 N.C. 231, 254, 302 S.E.2d 174, 187 (1983) ("agree[ing] with defendant's contention that he was entitled to discredit the prosecuting witness' testimony by attempting to show by cross-examination that she suffered from a mental impairment which affected her powers of observation, memory or narration") (citing 1 H. Brandis on North Carolina Evidence, *Witnesses*, § 44 (2d. Rev. 1982)). *See also, e.g., United States v. Golyansky*, 291 F.3d 1245, 1248 (10th Cir. 2002) ("potential *Brady/Giglio* information" held to include information regarding a "witness' serious mental health issues" triggering prosecutor's "affirmative duty to disclose the information"); *East v. Johnson*, 123 F.3d 235, 238 (5th Cir. 1997) (new trial ordered where state failed to disclose that witness "experienced bizarre sexual hallucinations and believed that unidentified individuals were attempting to kill her[,] . . . was incapable of distinguishing between reality and the fantasies caused by her hallucinations[, . . . and] was mentally incompetent to stand trial on a pending burglary charge").

However, failure to disclose evidence relating to a witness's mental health is not reversible error where there is no likelihood that the outcome of the trial was affected. *See United States v. Cole*, 293 F.3d 153, 157 (4th Cir. 2002), *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 296 (2002) (no *Brady* violation in prosecutor's belated disclosure of impeachment evidence of mental problems where "disclosed materials did not indicate that [witness's] disorders had any bearing on his ability to recall events and tell the truth"); *United States v. Burns*, 668 F.2d 855, 860 (5th Cir. 1982) (where psychologist "testified that [witness] was fully in touch with reality, [and] that his personality problems did not affect his ability to tell the truth" the State was under no duty to conduct further investigation into witness's mental health).

In *State v. Chavis*, 141 N.C. App. 553, 556, 540 S.E.2d 404, 408 (2000), the defendant sought discovery of the "psychiatric history of [the prosecuting witness] . . . to impeach the witness's ability to perceive, retain, or narrate." The trial court ruled that the prosecutor had "no duty to go out and find impeaching information with regard[] to its witnesses[,]" and this Court affirmed:

A defendant is constitutionally entitled to all exculpatory evidence, including impeachment evidence, in the possession of the State. The State, however, is under a duty to disclose only those

matters in its possession and 'is not required to conduct an independent investigation' to locate evidence favorable to a defendant. In this case, Defendant presented no evidence the State actually had [the witness'] medical and psychiatric history in its possession or that such history would have been favorable to Defendant. Accordingly, the State was under no obligation to obtain and disclose this information to Defendant.

*Chavis*, 141 N.C. App. at 561, 540 S.E.2d at 411 (quoting *State v. Smith*, 337 N.C. 658, 664, 447 S.E.2d 376, 379 (1994), and citing *Soyars*, 332 N.C. at 63, 418 S.E.2d at 490). Similarly, in *Smith*, 337 N.C. at 663, 447 S.E.2d at 379, the defendant moved for "disclosure of impeaching information as to whether [the] witness suffered from any mental defect or history of substance abuse which might affect her ability to recollect or recount the events occurring on the evening of [the offense]." The defendant contended that "his specific requests for discovery triggered the State's duty to determine if any such impeachment evidence existed and, if so, to disclose the information to the defense." The North Carolina Supreme Court held that:

the information requested exceeds the scope of *Brady* and the requirements of N.C.G.S. § 15A-903. The State is not required to conduct an independent investigation to determine possible deficiencies suggested by defendant in [the] State's evidence. . . . [D]efendant's motion was nothing more than a fishing expedition for impeachment evidence and the trial court properly disallowed the motion.

*Smith*, 337 N.C. at 663-64, 447 S.E.2d at 379.

In the instant case, defendant's motion does not suggest that Sylvia's ability to observe and testify to events was impaired by virtue of a mental defect, or by any medication used to treat a mental illness. Nor did defendant allege that information about Sylvia's mental health was in the possession of the State, or of persons acting on the State's behalf. At the pretrial hearing, the defendant alleged only that other witnesses would testify Sylvia acted "oddly" before the attempt on her husbands' life, and that Sylvia wrote letters to defendant indicating that she had consulted a psychiatrist and had taken some unidentified prescription medication.

Moreover, the denial of defendant's motion did not prevent him from exploring the issue at trial. Sylvia testified that although she was not under a doctor's care at the time of the shooting, a year earlier she had consulted a psychiatrist who prescribed an antidepressant.

She took the medication briefly, before deciding that it did not help her. She also took anti-anxiety medication and sleeping pills on an occasional basis. Sylvia testified that after her arrest, she saw a psychiatrist while in jail, because she was "dazed" and "cried all the time" after the "shock" of the incident and her incarceration. The psychiatrist prescribed antidepressants, but Sylvia again experienced unpleasant side effects, and stopped taking them. Defendant cross-examined Sylvia about her treatment for emotional problems, the medications that had been prescribed, and letters to defendant in which she described her reactions to the drugs. Groves also testified that Sylvia had received psychological counseling about a year before the shooting, and had taken medication for "nerves." Further, Phil Braswell, a private investigator hired by defendant, testified that when he interviewed Sylvia in jail, she had told him that prior to her arrest she was taking three different medications. We conclude that defendant was sufficiently able to develop this issue at trial. *See Newman*, 308 N.C. at 254, 302 S.E.2d at 187 (holding trial court did not err by limiting cross-examination where defendant able to "conduct a lengthy and in-depth cross-examination into the past mental condition of the prosecuting witness" and "the jury had ample opportunity to observe the prosecuting witness' demeanor and hear her responses to the questions posed so as to form an opinion as to whether her powers of observation, memory and narration were then so impaired that she was not a credible witness").

We conclude that the trial court did not err by denying defendant's pretrial motion to require the State to investigate in order to learn the identities of any mental health professionals with whom Sylvia had previously sought treatment. We hold that the denial of his motion did not violate defendant's right to due process. This assignment of error is overruled.

---

[2] Although the trial court denied defendant's pretrial motion for Sylvia's psychiatric treatment records, at some point certain records were forwarded from the jail to the trial court. Defendant's second argument is that the trial court erred by not providing him with these records. He asserts that the trial court "should have allowed the defendant access to Sylvia Groves' medical records because the trial court's *in camera* review was tantamount to no review at all." We disagree.

The defendant's right to exculpatory evidence often must be balanced against the privacy rights of witnesses. *State v. Johnson*, 145

N.C. App. 51, 55, 549 S.E.2d 574, 577 (2001) ("government entity has a statutorily protected right to maintain confidential records containing sensitive information such as child abuse"). In such situations, "a defendant's due process rights are adequately protected by an *in camera* review of the files of the government agency, after which the trial court must order the disclosure of any information discovered which is material to the defendant's guilt or innocence." *Id.* (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 94 L. Ed. 2d 40, 57 (1987)).

In the case *sub judice*, the trial court received a sealed copy of certain records forwarded from the jail where Sylvia was confined pending trial. The trial court examined these records *in camera* and ruled as follows:

> [U]pon inspection of these records I find nothing in the records that reveals any exculpatory information that would be of any benefit to the defendant. . . . Let the record further reflect that based on what I've read I've found nothing to be exculpatory, but I will also admit that there are some words in here that I could not make out what the word was. It was written in medical terms, medical language, medical abbreviations, and I could not determine or could not make out what the word was. Essentially I just couldn't read it.

Defendant argues on appeal that "[b]ecause the court admitted that the records . . . were incomprehensible, the court failed to review the records[.]" We disagree.

We first note that defendant failed to preserve this issue for appellate review. N.C.R. App. P. 10(b)(1) ("to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired . . . [and must] obtain a ruling upon the party's request, objection or motion"). After announcing its ruling, quoted above, the trial court immediately asked if there was "anything further" from either party. Defense counsel offered no response. The trial court's ruling appears to state clearly that certain individual medical terms were hard to decipher, and *not* that the records overall were hard to understand. It was defendant's responsibility to object, or to seek clarification.

In addition, this Court has undertaken an independent review of the medical records, and concludes that the trial court correctly ruled

that they did not contain exculpatory evidence. This assignment of error is overruled.

---

**[3]** Finally, defendant argues that the trial court committed reversible error by excluding certain cross-examination testimony of Agent Johnson, regarding statements purportedly made by Groves to Officer Perry shortly after the shooting. We conclude that the trial court did not err by excluding this cross-examination testimony.

At trial, Groves testified that he had several opportunities to view his assailant, whom he immediately recognized, and that he had provided a description of the shooter shortly after the shooting. However, Groves denied telling a law enforcement officer that "the man that shot me was wearing checkered pants." Subsequently, the State called Agent Johnson of the City County Bureau of Identification for Wake County, who testified concerning his collection of crime scene evidence on the night of the shooting. On cross-examination, Johnson denied speaking with Groves, who had already been taken to the hospital when Johnson arrived at the crime scene. He expressly denied having any first-hand knowledge of statements Groves may have made to other law enforcement officers. Johnson testified on cross-examination that when he prepared a report of the incident, he included statements allegedly made by Groves to Officer Perry, another non-testifying law enforcement officer, in which Groves described to Perry what his assailant was wearing. The defendant sought to cross-examine Johnson regarding this description of the shooter's clothing, and the trial court sustained the prosecutor's objection to this cross-examination. Defendant then made an offer of proof, which established that, if allowed to testify, Johnson would have stated that Perry informed him that Groves had said the shooter wore "some type of red colored checked pants." Defendant argues that this cross-examination testimony was admissible as a 'prior inconsistent statement' of Groves, and that its exclusion was reversible error.

"Prior statements of a witness which are inconsistent with his present testimony are not admissible as substantive evidence because of their hearsay nature. Even so, such prior inconsistent statements are admissible for the purpose of impeachment[.]" *State v. Bishop*, 346 N.C. 365, 387, 488 S.E.2d 769, 780 (1997) (quoting *State v. Lane*, 301 N.C. 382, 386, 271 S.E.2d 273, 276 (1980)).

"When a prior inconsistent statement by a witness relates to material facts in the witness' testimony, the prior statement may be proved by extrinsic evidence." *State v. Jones*, 347 N.C. 193, 205, 491 S.E.2d 641, 648 (1997) (citing 1 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 161 (4th ed. 1993) (hereinafter 1 *Broun on Evidence*)). Such extrinsic evidence may include testimony from another witness to whom the inconsistent statement was made. *State v. Workman*, 344 N.C. 482, 476 S.E.2d 301 (1996) (allowing cross-examination of officer regarding witness's prior inconsistent statement to officer). However, in the case *sub judice*, defendant did not seek to impeach Groves with testimony from Officer Perry, to whom Groves allegedly made the statement. Rather, he tried to introduce cross-examination testimony of Johnson, repeating what Perry told him that Groves had said. This is similar to the situation presented in *State v. Ward*, 338 N.C. 64, 449 S.E.2d 709 (1994). In *Ward*, a witness for the State denied making certain statements regarding the number of gunshots he heard. The defendant attempted to impeach the witness by cross-examining the medical examiner about what a sheriff's deputy had told the medical examiner that the witness said to the deputy about the number of shots fired. The North Carolina Supreme Court ruled that the trial court properly excluded such cross-examination:

> [T]he making of the [inconsistent] statements *must be proved by direct evidence and not by hearsay*; and a witness may not be impeached by the inconsistent statements of someone else. . . . 'Proof of a prior statement by a witness who heard it at second hand would clearly be inadmissible.' . . . Because the statement defendant alleges the witness made to the deputy relates to material facts in the testimony, namely, the number of gunshots heard on the night of the killing, it may be proved by others—the deputy, for example, or a bystander who overheard the witness make the statement to the deputy. However, *defendant sought to prove the prior inconsistent statement by a witness who heard second hand from the deputy* [what the] neighbor told the deputy . . . *such second hand proof is clearly inadmissible*, and the trial court did not err in excluding it.

*Ward* at 98, 449 S.E.2d at 727-28 (citing 1 *Broun on Evidence* § 159, at 523-28 and § 161, at 531) (emphasis added). We conclude that, as in *Ward*, the trial court did not err by excluding this evidence.

Defendant also argues that the cross-examination testimony was admissible because it was based upon notes in Officer Johnson's

STATE v. LYNN

[157 N.C. App. 217 (2003)]

report, which he contends was admissible under N.C.G.S. § 8C-1, Rule 803(8) (2001), the hearsay exception for public records and reports ("matters observed pursuant to duty. imposed by law as to which matters there was a duty to report"). However, defendant did not seek to admit the testimony under this theory at trial, and never sought to admit the officer's report into evidence. Defendant did not preserve this argument for appellate review. N.C.R. App. P. 10(b)(1).

Finally, even assuming, *arguendo*, that the statement was admissible, defendant cannot show prejudice by its exclusion. Sylvia and Groves both testified unequivocally that defendant shot Groves. Kehle corroborated Groves' having identified defendant immediately after the shooting. Sylvia testified that she was the one who offered the description of defendant's 'checkered pants.' Defendant's fingerprints were found on a truck in Groves' driveway. Under N.C.G.S. § 15A-1443 (2001), the defendant is prejudiced by non-constitutional errors only if "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." Moreover, the "burden of showing such prejudice under this subsection is upon the defendant." We conclude that there is no reasonable possibility that the outcome of the trial would have been different if Agent Johnson had testified that Officer Perry told him that Groves had described the defendant as wearing checkered pants. This assignment of error is overruled.

For the reasons discussed above, we conclude that the defendant received a fair trial, free from prejudicial error. His conviction is, therefore,

Affirmed.

Judges McGEE and HUDSON concur.