STATE OF NORTH CAROLINA v. TORRIANO THOMPSON

No. COA07-351

(Filed 4 December 2007)

**1. Identification of Defendants— spontaneous in-court identification—motion to suppress denied**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress an identification made by a witness who immediately said "That's the guy . . ." when defendant was brought into court. The trial court's conclusions were supported by its findings: the witness had seen the shooter before the crime, she had ample opportunity to see him at the crime, and no one had suggested to her that she should identify anyone in court.

**2. Criminal Law— continuance denied—preparation for cross-examination**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion for a continuance to prepare for cross-examination of a witness who identified defendant as he was brought into the courtroom. Defendant had almost three years to prepare for the possibility that this person, the only eyewitness, might identify him. Also, defendant vigorously cross-examined the witness.

**3. Criminal Law— continuance denied—preparation for cross-examination**

The trial court did not err in a first-degree murder prosecution by denying a defendant's motion for a continuance to prepare for the cross-examination of a witness who had participated in the crime. The trial took place three years after the shooting and defense counsel conceded that the witness list included this person. Moreover, the testimony was largely cumulative.

**4. Evidence— mental health records sealed by trial court—reviewed on appeal**

Mental health, substance abuse, or treatment records concerning a witness in a first-degree murder prosecution which had been sealed by the trial court were reviewed on appeal and found to contain no material evidence favorable for the defense.

STATE v. THOMPSON

[187 N.C. App. 341 (2007)]

**5. Appeal and Error— preservation of issues—discovery— material not included in record—report not in State's possession**

Defendant did not preserve for appeal the issue of his right to discoverable material from jail records and the results of a psychological evaluation conducted privately at the request of a witness's attorney. The record does not include the jail records or a request for them, and the psychological report concerning the witness was not in the State's possession.

Appeal by Defendant from judgment entered 21 April 2006 by Judge J. Gentry Caudill in Mecklenburg County Superior Court. Heard in the Court of Appeals 17 October 2007.

*Attorney General Roy Cooper, by Special Deputy Attorney General L. Michael Dodd, for the State.*

*Kathryn L. VandenBerg, for Defendant.*

ARROWOOD, Judge.

Defendant, Torriano Thompson, appeals from judgment entered on his conviction of first degree murder and armed robbery. We find no error.

In the early morning hours of 24 May 2003, law enforcement officers from the Charlotte-Mecklenburg Police Department were summoned to the Howard Johnson hotel on Tuckaseegee Road in Charlotte, North Carolina (the Howard Johnson). There they found Arthur Reyes (Reyes) lying on the floor of his room, having died from gunshot wounds to his knee and chest. On 29 May 2003, Defendant was arrested and charged with armed robbery and first degree murder of Reyes. In April 2006, almost three years after his arrest, Defendant was tried before a Mecklenburg County jury.

The State's trial evidence tended to show, in pertinent part, the following: In May 2003 Reyes was employed in the construction industry. On Friday 23 May 2003, Reyes received his salary in cash and checked into Room 147 at the Howard Johnson. Pankaj Patel (Patel), the owner of the Howard Johnson, testified that he noticed a number of visitors to Reyes' room, including Virgil Young (Young), a man whom Patel had previously banned from the hotel. Around midnight on 23 May, Patel and his assistant, Aakush Joshi (Joshi), left the hotel to run some errands. On their return, Patel and Joshi heard gun-

shots and saw Reyes lying on the floor of Room 147. Patel immediately called 911, and law enforcement officers arrived shortly thereafter. Joshi corroborated Patel's testimony, and added that the Howard Johnson was frequented by drug users and prostitutes, and that he had seen an African-American man leaving Room 147 just after the gunshots.

The most important testimony came from three of the State's witnesses: Paula Greene (Greene), Shari Queen (Queen), and Catrina Coates Clarty (Clarty). Greene provided the only eyewitness testimony about the shooting. She testified that on 23 May 2003 she was staying in Room 106 of the Howard Johnson. At that time Greene was a prostitute and frequent user of crack cocaine, with a criminal record that included drug charges. When shown a photograph of Russell Calfee, Greene identified him as a man who was known to give drug users and prostitutes rides in his car in exchange for drugs or money.

On 23 May Calfee gave Greene a ride to the Guest House hotel, located next to the Howard Johnson. The Guest House, like the Howard Johnson, was frequented by drug users and prostitutes. At the Guest House, Greene visited a woman named Jody. Several others were visiting Jody, including Queen, another drug user and prostitute. Queen told the group at Jody's room that she'd been smoking crack with Reyes, and that he had a lot of money. Queen tried to get someone to help her rob Reyes.

Greene did not want to participate in the robbery. Instead she returned to the Howard Johnson, hoping to negotiate a sex-for-money transaction with Reyes before Queen did, in order to "steal her trick." Sometime after midnight, Greene went to Reyes' room, where she and Reyes decided to smoke crack and have sex. A little while later, they heard someone knock on the door and ask to come in. Reyes did not open the door because Greene recognized Queen's voice and threatened to leave if Reyes let Queen in the room. However, when they heard a second knock a few minutes later, Reyes opened the door.

Greene testified that as soon as the door was open, the Defendant burst into the room holding a gun and shouting at Reyes to "Give me your G—d— money!" Greene urged Reyes to comply with Defendant's demand. When Reyes did not heed Greene's advice, the Defendant shot Reyes several times, and Greene saw Reyes fall on the ground. The Defendant took Reyes' wallet, which Greene described

as having a Harley Davidson™ logo and an attached chain, and then ran out of the room.

Queen's testimony placed Defendant in Reyes' room at the time Reyes was shot, with a plan to rob Reyes. Queen testified that in 2003 she was a drug addict and prostitute. She first met Defendant in Jody's room a few days before Reyes was shot. On 23 May 2003 Queen spent time at Jody's with Defendant and his cousin Eric Sloan (Sloan), before going to the Howard Johnson to engage in prostitution. At the Howard Johnson, Queen introduced herself to Reyes and visited with him in his room for several hours. Reyes told Queen that he wanted crack cocaine and sex, and Queen promised to provide both. She called drug dealers of her acquaintance, and a man she knew as "Duck" came to Room 147 and sold Reyes a small amount of crack cocaine. Queen and Reyes smoked it, and agreed to postpone their sexual activity. A few minutes later, Young joined them and the three smoked crack cocaine and talked. Queen called another drug dealer she knew as "D'Lo," who sold Reyes a larger quantity of crack cocaine. Queen testified that she and Young noticed that Reyes had a lot of money.

After several hours, Queen excused herself and returned to Jody's room at the Guest House. Jody was entertaining guests that night, including Greene, Calfee, Defendant, and Sloan. Queen told the assembled friends about Reyes, stressing how much money he appeared to have and tried to recruit someone to help her rob him. Jody was disinclined to help, as she and Reyes were friends. As previously discussed, Greene took the opportunity to sneak away and arrange a paid "date" with Reyes before Queen did. Queen judged Calfee to be insufficiently stalwart for a robbery. However, when Defendant agreed to help Queen steal Reyes' money, she accepted his offer. Sloan drove Calfee's car back to the Howard Johnson, accompanied by Defendant, Queen, and Calfee. Queen testified that she and Defendant went to Reyes' room in the early morning hours of 24 May, with the intention of robbing Reyes. Their plan was for Queen to knock on the door and gain admittance to Reyes' room. When Reyes opened the door, Queen would leave. Defendant would then pretend to be a drug dealer and when Reyes took out money to pay for drugs, Defendant would grab the money and leave.

At the Howard Johnson, Queen and Defendant disembarked and went to Reyes' room. Queen corroborated Greene's testimony that the first time she knocked Reyes refused to open the door. When she knocked again and Reyes opened the door to admit her, Queen imme-

diately turned and went back to the car. A few minutes after she got back to Calfee's car, Defendant returned, holding a black wallet with a chain. Defendant told Sloan "I had to shoot him." They returned to Jody's room at the Guest House, and Queen and Calfee received $60.00 and $40.00, respectively, for their part in the robbery.

Queen was questioned several times by law enforcement officers, gave recorded statements, and identified photographs of Young, Defendant, Greene, and the drug dealers she knew as Duck and D'Lo. After her third interview, Queen was arrested and charged with first degree murder, armed robbery, and attaining the status of a habitual felon. Shortly before trial, Queen accepted a plea arrangement in which the State agreed to drop the charges of first degree murder and attaining the status of a habitual felon, in exchange for Queen's truthful testimony at Defendant's trial and her plea of guilty to one count of armed robbery and one count of common law robbery. On cross-examination, Queen admitted that: she was a long-time drug user and prostitute; she had an extensive criminal record; she initially lied to the police about her role in the shooting; she had been diagnosed with serious psychological and emotional problems; and she was motivated to testify in part to shorten her own prison sentence.

Catrina Coates Clarty testified that she and Defendant dated for about a year and had broken up several months before Reyes was shot but remained good friends. On 24 or 25 May 2003 Defendant called Clarty and said he needed to talk to her. When they met the next day, Defendant told Clarty that he had shot Reyes. Clarty's recitation of what Defendant told her generally corroborated the testimony of other witnesses. Defendant told Clarty that Queen had described Reyes as an easy target for robbery; that Defendant, Queen, and others drove from the Guest House to the Howard Johnson; and that after Queen knocked on Reyes' door and got him to open it, Defendant went in and told Reyes to "give up" his money. Defendant also admitted to Clarty that he had shot Reyes, although he described the shooting as the accidental result of a "tussle" over Defendant's gun.

Clarty was upset by Defendant's confession and feared that she could face criminal charges unless she shared the information with law enforcement officers. A few days later, Clarty met with Charlotte-Mecklenburg Police Department Homicide Detective Valencia Rivera and gave a statement detailing Defendant's admissions to her. Clarty also worked with law enforcement officers to lure Defendant into

meeting her at a prearranged location, where Defendant was arrested without incident.

Other State's witnesses corroborated the testimony of Queen, Greene, and Clarty. Calfee testified that he was socially acquainted with both Defendant and Sloan, and that in May 2003 he was a crack cocaine user who earned money for drugs by giving people rides in his car. In the early morning hours of 24 May 2003, Calfee, Sloan, Defendant, Greene, and Queen visited Jody in her hotel room and then used Calfee's car to drive next door to the Howard Johnson. Queen and Defendant got out of the car, while Calfee stayed behind and smoked crack cocaine. Queen came back first, followed by Defendant, who said "I shot him in the leg" as he got in the car.

Sloan testified that he was a good friend of Defendant, and that on 24 May 2003 Sloan drove Calfee's car from the Guest House to the Howard Johnson. Sloan understood their purpose was to "pick up" some money, but heard nothing about a robbery. Before leaving Jody's room, Defendant obtained Sloan's gun which he still had several hours later, when Sloan dropped Defendant off at his house.

Chantell Hill testified that in May 2003 she was Defendant's girlfriend, and that she had seen him with a gun several times during their relationship. Hill recalled that on the evening of 23 May 2003 Defendant went out with Calfee. She also identified cell phone accounts corresponding to calls that may have been made by Defendant.

Young testified that he had spent time in Reyes' room with Queen, and that the three had been drinking and smoking crack cocaine. He corroborated Queen's testimony that she had left before he did. At around midnight, Reyes asked Young to go next door to a gas station and buy more beer and cigarettes. However, when he got back to the hotel, Young saw law enforcement officers there, so he did not go to Reyes' room.

The State also presented testimony from law enforcement officers who had investigated the case and taken statements from State's witnesses. Their testimony generally corroborated that of the other witnesses. Additional State's evidence will be discussed as necessary to the issues on appeal.

The Defendant did not present evidence. Following the presentation of evidence, the jury found the Defendant guilty of first degree murder on the theory of felony murder, but found him not guilty of

murder on the theory of premeditation and deliberation. He was also convicted of armed robbery. Defendant was sentenced to life in prison without parole for first degree murder, and judgment was arrested on his conviction of armed robbery. From this judgment, Defendant timely appealed.

---

**[1]** Defendant argues first that the trial court erred by allowing Paula Greene to identify Defendant as the shooter, on the grounds that her identification was based on an impermissibly suggestive procedure, lacked reliability, held a substantial risk of mistaken identification, and had no independent origin. We disagree.

As the only eyewitness to Reyes' shooting, Greene was questioned several times by law enforcement officers. Her statements were recorded and provided to defense counsel prior to trial. In one statement Greene said that, although she did not know the name of the shooter, she had seen him a few times before the shooting, and would recognize him if she saw him in person. However, the State did not ask Greene to participate in any pretrial identification procedures that included Defendant, and, pursuant to a sequestration order, Greene was excluded from the courtroom until it was time for her to testify. Therefore, the first time Greene saw Defendant after the shooting was when she entered the courtroom to testify.

When Greene saw Defendant in court, she immediately said "That's him right there. That's the guy that shot [Reyes.]" Defendant moved to suppress her in-court identification on the grounds that it was based on the impermissibly suggestive circumstance of seeing Defendant in court, and did not have an independent origin. After conducting a *voir dire* hearing, the trial court ruled that Greene's identification was admissible.

Defendant argues on appeal that Greene's identification of Defendant was "equivalent to a pretrial 'show-up' and violated his due process rights. A "show-up" refers to "the practice of showing suspects singly to witnesses for purposes of identification[.]" *State v. Turner*, 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982). Although show-ups "have been criticized as an identification procedure," they "are not *per se* violative of a defendant's due process rights." *Id.*

"Whether an identification procedure is unduly suggestive depends on the totality of the circumstances[:]

A due process analysis requires a two-part inquiry. "First, the Court must determine whether the identification procedures

were impermissibly suggestive." If so, "the Court must then determine whether the [suggestive] procedures created a substantial likelihood of irreparable misidentification."

*State v. Rogers*, 355 N.C. 420, 432, 562 S.E.2d 859, 868 (2002) (quoting *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684, 698 (2001)) (citations omitted).

After determining whether a witness's identification should be suppressed, the trial court is required by N.C. Gen. Stat. § 15A-977(f) (2005) to enter an order stating its findings of fact and conclusions of law. On appeal, "[o]ur review of a denial of a motion to suppress by the trial court is 'limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.' " *State v. Barden*, 356 N.C. 316, 340, 572 S.E.2d 108, 125 (2002) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)).

In the instant case, the trial court dictated a proposed order during jury deliberations. The transcript includes the court's proposed findings of fact, but the Record on Appeal does not include a formal written order filed with the Clerk. However, this does not necessarily invalidate the trial court's ruling:

> In *State v. Jacobs*, [(2005)] . . . this Court determined that the trial court did not err when it failed to enter written findings because "the trial court did provide its rationale from the bench." The *Jacobs* Court further relied on a prior decision from our Supreme Court that determined "[i]f there is no material conflict in the evidence on voir dire, it is not error to admit the challenged evidence without making specific findings of fact. . . . In that event, the necessary findings are implied from the admission of the challenged evidence." In this case, as in *Jacobs*, the trial court provided its rationale from the bench and there were no material conflicts in the evidence.

*State v. Shelly*, 181 N.C. App. 196, 204-05, 638 S.E.2d 516, 523 (2007) (quoting *State v. Phillips*, 300 N.C. 678, 685, 268 S.E.2d 452, 457 (1980) and citing *State v. Jacobs*, 174 N.C. App. 1, 7-8, 620 S.E.2d 204, 209 (2005), *disc. review denied*, 361 N.C. 565, 640 S.E.2d 389 (2006)), *disc. review denied*, 361 N.C. 367, 646 S.E.2d 768 (2007).

In the case *sub judice*, there was no conflict in the evidence, as Greene was the only *voir dire* witness on the issue of the admissibil-

ity of her identification. She testified, *inter alia*, that she was able to see Defendant clearly in the small hotel room, and that she had no doubt that he was the person who had shot Reyes. Greene also said that, although she did not know Defendant's name at the time of the shooting, she knew she had seen him before in Charlotte.

The court stated its rationale when it dictated its proposed findings of fact, including, in pertinent part, the following:

3. That just prior to the suppression motion being made, the witness Greene was called into the courtroom to be the next witness for the State after the lunch recess.

4. That the State's witnesses were under a sequestration order, and Paula Greene had not been in the court prior to [that]. . . .

5. That the witness Greene, was sitting [in] the back of the courtroom . . . when the Defendant, who is in the custody of the Sheriff, was brought into the courtroom.

6. As Defendant walked by Paula Greene, she stated "Oh my God. That's the guy who shot [Reyes]."

7. That prior to Paula Greene seeing the Defendant in the courtroom . . . no one had suggested in any way that Paula Greene should identify anyone in the court.

8. That . . . [in an] interview with law enforcement officers, Ms. Greene said that she had seen the person in the area before, but did not know his name. And that information was made available to the Defendant as discovery.

. . . .

12. That in the hearing before the undersigned . . . Paula Greene identified the Defendant as the man that came into the victim's room, demanded money, shot the victim and then fled from the room.

13. That Ms. Greene testified she had seen the Defendant on prior occasions around the area where the shooting occurred, but did not know his name.

14. That Ms. Greene had good opportunity to see and hear the person that shot the victim.

"On a motion to suppress evidence, the trial court's findings of fact are conclusive on appeal if supported by competent evidence."

*State v. Campbell*, 359 N.C. 644, 661, 617 S.E.2d 1, 12 (2005) (citations omitted). We conclude that the trial court's findings, as announced in court and implied from its admission of Greene's identification of Defendant, were supported by Greene's testimony. "Therefore, the scope of our inquiry is limited to the superior court's conclusions of law, which 'are fully reviewable on appeal.' " *State v. Sinapi*, 359 N.C. 394, 398, 610 S.E.2d 362, 365 (2005) (quoting *State v. Smith*, 346 N.C. 794, 797, 488 S.E.2d 210, 212 (1997)). Based on its findings, the trial court dictated its conclusions:

> 1. That the witness Paula Greene's in-court identification of the Defendant is based on her observations of the shooting at the time that the victim was shot in May of 2003.
>
> 2. That Ms. Greene had ample opportunity to see the shooter and reason to closely observe that person.
>
> 3. That Ms. Greene had seen the shooter before, and recognized him at the time of the shooting.
>
> 4. That no pretrial identification procedure with Ms. Greene involving the Defendant or Defendant's photograph, was conducted prior to Paula Greene recognizing the Defendant in the courtroom.
>
> 5. That no law enforcement officer, prosecutor, or other representative of the State, did anything to suggest Paula Greene should identify the Defendant.
>
> 6. That Paula Greene's in-court identification of the Defendant is based on having seen the shooting of the victim in May of 2003. And is not based on any improperly suggestive action by any representative of the State.

We conclude that the trial court's conclusions were supported by its findings of fact, and that the trial court did not err by denying Defendant's suppression motion. This assignment of error is overruled.

[2] Defendant made two continuance motions during trial, on the grounds that he needed additional time to prepare for cross-examination of two State's witnesses, Paula Greene and Eric Sloan. In his next two arguments, Defendant asserts that the trial court erred by denying his motions. We disagree.

" 'It is well settled that a motion for continuance is addressed to the discretion of the trial judge and we will not disturb that ruling

absent an abuse of that discretion.'" *State v. Collins*, 160 N.C. App. 310, 319, 585 S.E.2d 481, 488 (2003), *aff'd*, 358 N.C. 135, 591 S.E.2d 518 (2004) (quoting *State v. Wilfong*, 101 N.C. App. 221, 223, 398 S.E.2d 668, 670 (1990)). On appeal, Defendant argues that the denial of his continuance motions was a violation of his due process rights under the state and federal constitutions. However, Defendant made no constitutional argument to the trial court regarding either Greene or Sloan. "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *State v. Lloyd*, 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001) (citations omitted). Accordingly, we review the trial court's rulings for abuse of discretion.

As discussed above, Greene entered the courtroom shortly before she was scheduled to testify and identified Defendant as the person whom she saw shoot Reyes on 24 May 2003. Upon learning of Greene's positive identification of Defendant, defense counsel asked the court to recess until after lunch, so he could conduct legal research on the admissibility of Greene's identification.

Because the State did not conduct any pretrial identification procedures giving Greene the chance to identify Defendant, neither the State nor Defendant could be certain before trial that Greene would identify Defendant in court as the shooter. On appeal, Defendant contends that he needed additional time to prepare to cross-examine Greene about her identifying him as the shooter. However, the record establishes the following:

Defendant was informed that Greene was the only eyewitness to the shooting.

Defendant was informed that Greene told law enforcement officers that she had seen the shooter before, and that she would be able to identify him if she saw him again.

The trial was held almost three years after the shooting.

Defendant had almost three years to prepare for the possibility that Greene, the only eyewitness, might identify him as the shooter. We conclude that this was ample time to prepare for cross-examination. We also note that Defendant vigorously cross-examined Greene at trial. On cross-examination, Greene admitted that in May 2003 she was a drug user and prostitute with a criminal record, that she'd smoked crack cocaine before the shooting, that the shooting happened very quickly, and that she was frightened during the incident.

We conclude that the trial court did not abuse its discretion by denying Defendant's motion for a continuance of two or three hours to conduct further legal research. This assignment of error is overruled.

**[3]** We next consider Defendant's request for a continuance before Sloan testified. It is undisputed that Defendant and Sloan had been close friends for many years, and that Sloan continued to reside in Charlotte after the shooting. Shortly before trial, the State offered Sloan immunity in exchange for his truthful testimony at trial, and Sloan gave a short statement. Defense counsel conceded in court that "I was aware, obviously, that Mr. Sloan was on [the State's] witness list. He is supposedly somebody that was present, and was driving the car, and all those types of things." However, Defendant asked the court for a continuance in order to "see if there is any investigation that we need to do, before Mr. Sloan is on the stand and testifies." We note again that the trial took place almost three years after the shooting. We conclude that Defendant had ample time to anticipate Sloan's testimony or to conduct any necessary investigation.

Moreover, Sloan's testimony was largely cumulative. Sloan testified that: he, Defendant, and Queen drove to the Howard Johnson; although they were there to get some money, he had not heard anyone talk about robbery; Defendant had a gun when they went to the Howard Johnson; Queen and Defendant got out of the car at the Howard Johnson and Queen returned first, followed by Defendant; and that Defendant did not do or say anything unusual upon his return. Notably, Sloan did not testify to Defendant's participation in any criminal activity other than drug use. We conclude that the trial court did not abuse its discretion by denying Defendant's motion to continue the case. This assignment of error is overruled.

---

**[4]** Finally, Defendant asks this Court to "review sealed mental health records to determine whether they include favorable and material evidence for the defense."

"Defendant has a constitutional right to the disclosure of exculpatory or favorable evidence." *State v. Soyars*, 332 N.C. 47, 63, 418 S.E.2d 480, 490 (1992) (citing *United States v. Bagley*, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 490 (1985) and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963)). Consequently, "[t]he prosecution is required to turn over to a defendant favorable evidence that is material to the guilt or punishment of the defendant. Evidence is considered 'material' if there is a 'reasonable probability' of a different

result had the evidence been disclosed." *State v. Berry*, 356 N.C. 490, 517, 573 S.E.2d 132, 149 (2002) (citations omitted).

"Impeachment evidence . . . falls within the *Brady* rule." *Bagley*, 473 U.S. at 676, 87 L. Ed. 2d at 490. "Moreover, such impeachment evidence may include evidence that a witness suffers from a serious psychiatric or mental illness. The rationale behind allowing impeachment by evidence of prior treatment for psychiatric problems is that although 'instances of . . . mental instability are not directly probative of truthfulness, they may bear upon credibility in other ways, such as to cast doubt upon the capacity of a witness to observe, recollect, and recount[.]' " *State v. Lynn*, 157 N.C. App. 217, 220-21, 578 S.E.2d 628, 630 (2003) (quoting *State v. Williams*, 330 N.C. 711, 719, 412 S.E.2d 359, 364 (1992)) (internal citation omitted). " 'The State, however, is under a duty to disclose only those matters in its possession and is not required to conduct an independent investigation to locate evidence favorable to a defendant.' " *Lynn*, 157 N.C. App. at 221-22, 578 S.E.2d at 632 (quoting *State v. Chavis*, 141 N.C. App. 553, 561, 540 S.E.2d 404, 411 (2000)) (internal quotation marks and citation omitted).

As regards potentially exculpatory information contained in personal treatment records, "[a] defendant's right to exculpatory evidence often must be balanced against the privacy rights of witnesses. In such situations, 'a defendant's due process rights are adequately protected by an *in camera* review of the files of the government agency, after which the trial court must order the disclosure of any information discovered which is material to the defendant's guilt or innocence.' " *Lynn*, 157 N.C. App. at 223-24, 578 S.E.2d at 633 (quoting *State v. Johnson*, 145 N.C. App. 51, 55, 549 S.E.2d 574, 577 (2001)) (citation omitted).

"On appeal the appellate court is required to examine the sealed records to determine whether they contain information that is favorable and material to an accused's guilt or punishment." *State v. Thaggard*, 168 N.C. App. 263, 280, 608 S.E.2d 774, 785 (2005) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 94 L. Ed. 2d 40, 57 (1987)).

In the instant case, Defendant filed pretrial motions seeking *in camera* review of mental health, substance abuse, or treatment records for Queen in the possession of either the Charlotte-Mecklenburg County jail or of "Exodus House," a substance abuse treatment center. Defendant also sought review of the results of a private psychological examination conducted at the request of Queen's

counsel. On 15 March 2006 Judge Timothy L. Patti ordered both the Mecklenburg County Jail and the director of Exodus House to provide copies of Queen's treatment records for the court's review. Judge Patti entered an order on 13 April 2006 stating that the court had conducted an *in camera* review of "most of" those records, and that discoverable materials would be released to the Defendant for use at trial. The order stated further that:

> [A] psychological evaluation of [Queen] represented by Attorney Susan Weigand was done at Attorney Weigand's request and the psychological report is not in the possession of the State of North Carolina . . . the Court will not . . . [give] the Defendant the psychological evaluation of [Queen.]

Certain records from Exodus House that were not reviewed before trial were therefore reviewed by Judge Caudill, who presided over the trial. Excerpts from these Exodus House records were given to Defendant. After the trial, the court entered an order stating that it had sealed the Exodus House records in four envelopes: three envelopes containing all the records provided to the court, and a fourth envelope containing the materials that the court had deemed discoverable and had given Defendant. These four envelopes are the only records requested by defense counsel on appeal, and are the only records included in the Record on Appeal. We have reviewed these records and conclude that they contain no material favorable evidence. This assignment of error is overruled.

[5] On appeal, Defendant also discusses his right to discoverable material from the jail records and from the results of a psychological evaluation conducted privately at the request of Queen's attorney. We conclude that Defendant has not preserved either of these issues for appellate review. Regarding the jail records, the record includes neither the jail records nor any request for same. Therefore, we are unable to review this issue. Additionally, the basis asserted by Defendant for access to the psychological report arranged by Queen's attorney was his right to disclosure by the State of favorable evidence in its possession. We agree with the trial court that this record was not in the State's possession.

For the reasons discussed above, we conclude that the Defendant had a fair trial, free of reversible error.

No error.

Judges CALABRIA and STEPHENS concur.