IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-134

Filed: 7 January 2020

Cleveland County, Nos. 18 CRS 50772-74

STATE OF NORTH CAROLINA

v.

EHTASHAM M. HOQUE, Defendant.

Appeal by Defendant from judgments entered 5 September 2018 by Judge Robert C. Ervin in Cleveland County Superior Court. Heard in the Court of Appeals 22 August 2019.

> *Attorney General Joshua H. Stein, by Assistant Attorneys General Kathryne E. Hathcock and Jonathan E. Evans, for the State-Appellee.*
>
> *Arnold & Smith, PLLC, by Paul A. Tharp, for Defendant-Appellant.*

COLLINS, Judge.

Defendant Ehtasham Hoque appeals from judgments entered upon jury verdicts of guilty of driving while impaired and resisting a public officer, and responsible for possessing an open container of alcoholic beverage. Defendant argues that the trial court (1) erred by denying his motion to dismiss; (2) erred by denying his motion to suppress; (3) abused its discretion by admitting certain evidence; and (4) erred in determining that law enforcement officers did not violate his constitutional rights. We discern no error or abuse of discretion.

## I.  Procedural History

On 16 April 2018, Defendant was indicted for driving while impaired ("DWI"), resisting a public officer, and driving a motor vehicle on a highway with an open container of alcoholic beverage after drinking.  A trial commenced on 4 September 2018.  On the second day of the trial, Defendant filed a motion to suppress the results of a chemical analysis of Defendant's blood and requested special jury instructions on spoliation of evidence, specifically a vodka bottle and body-camera recordings.  The trial court denied Defendant's motion to suppress the blood test results, agreed to give a spoliation instruction for the vodka bottle, and refused to give a spoliation instruction for the body-camera recordings.  At the close of the State's evidence, Defendant made a motion to dismiss all charges for insufficient evidence.  The trial court granted the motion as to misdemeanor possessing an open container after drinking, allowing an infraction charge of possession of an open container to go forward.  The trial court denied the motion to dismiss as to the charges of DWI and resisting a public officer.  On 5 September 2018, the jury found Defendant guilty of DWI and resisting a public officer, and responsible for possessing an open container.

The trial court entered judgment upon the jury's verdicts.  Defendant timely appealed.

## II. Factual Background

The State's evidence tended to show the following: At around 6:00 a.m. on 20 February 2018, Officer Joshua Richard of the Shelby Police Department was dispatched in response to a call reporting a stationary car in the middle of Earl Street. Upon his arrival, Richard observed a beige Toyota Prius in the "dead middle of the roadway" with its headlights turned on and the engine running. Richard approached the car and observed a male, later identified as Defendant, "slumped over appearing to be asleep in the driver's seat." Richard did not see any other passengers in the car. When Richard knocked on the driver's side window, Defendant would not speak to him. Richard asked Defendant to roll down his window, but Defendant refused. Richard opened the door, asked Defendant his name, and engaged Defendant in conversation. Richard observed that Defendant was "groggy" and his breath smelled of alcohol.

While waiting for other officers to arrive, Richard tried to determine Defendant's name. Defendant produced a bank card as his only form of identification. Richard saw an open New Amsterdam vodka bottle in between Defendant's legs. Defendant then "revved his engine very high" and "pressed the gas." After Richard turned the engine off by depressing the keyless push-button, Defendant tried to restart the car several times. Richard realized he had not turned on his chest-mounted body camera, so he activated it at that time.

Defendant asked if he could pull the car forward and attempted to start the car "a couple more times," despite Richard telling him to stop. Defendant also stated that he was at home; Richard explained to Defendant that he was actually in the middle of the road. Richard observed that Defendant appeared "disheveled" and that his "eyes were very glossy and bloodshot-appearing."

Officers Smith, Kallay, Torres, and Hill arrived on the scene and activated their body cameras. Smith observed Defendant sitting in the driver's seat of the car and engaged Defendant in conversation. Defendant told Smith that "he had just a few sips [of alcohol] just a couple hours ago." Smith smelled a "very strong odor of alcohol" on Defendant's breath and noticed that Defendant's eyes were red and glassy, and that his movements were slow and labored. Smith thought Defendant's movements were labored due to alcohol consumption. Upon Smith's request, Defendant got out of the car for field sobriety testing. Smith performed a horizontal gaze nystagmus test; Defendant failed, showing all six signs of impairment. Defendant also failed a vertical gaze nystagmus test, which led Smith to believe that Defendant was "significantly high."

While Smith was performing the field sobriety tests, Torres observed that Defendant was "very slow to react" and had "red, glassy eyes" and "slurred speech." Defendant did not understand where he was or what time it was, and he had a hard

time answering questions. Torres saw the open alcohol bottle between Defendant's legs.

Smith asked Defendant to provide a breath sample on the portable alcosensor. Although Defendant initially agreed, he refused 10 to 12 times when asked to give a sample. Defendant repeatedly placed his hands in his pockets, which Smith told him not to do. Because Defendant was making Smith feel concerned for his own safety, Smith grabbed Defendant's right wrist to pull it out of Defendant's pocket and said, "The games are over. We're not going to put our hands back in our pockets anymore." After Defendant refused one last opportunity to provide a breath sample, Smith began to arrest him.

Because Defendant "tensed up" and "pulled his arms back," Richard and Torres assisted Smith in placing Defendant under arrest. Defendant continued to struggle with the officers, fell down to his knees, and began shouting and crying. Smith and Torres adjusted Defendant's handcuffs, and Defendant stopped shouting and crying. When Smith and Torres tried to place Defendant into the patrol car, Defendant was uncooperative and would not put his legs in the car. Torres grabbed Defendant's legs, placed them inside the car, and shut the door. Torres smelled alcohol on Defendant's breath. Kallay retrieved the vodka bottle and gave it to Smith. Smith poured the liquid out of the bottle in accordance with the police department's common practice

and placed the bottle in the patrol car. After Defendant was in the back of the patrol car, Smith turned off his body camera.

Smith transported Defendant to the Law Enforcement Center annex for a chemical analysis of his breath and explained Defendant's implied consent rights to him. Smith did not have his body camera turned on while at the Law Enforcement Center annex, in violation of his department's policy. Defendant refused to sign the implied rights form and did not request an attorney. Smith gave Defendant one more opportunity to submit a breath sample. Defendant did not put his mouth on the intoxilyzer machine or attempt to blow. After Smith marked Defendant as refusing to provide a breath sample, Smith obtained a search warrant for Defendant's blood from the magistrate.

Smith transported Defendant to the hospital to have a blood sample taken. At the hospital, Defendant told the nurse that she did not have his permission to take his blood. Hospital staff told Smith that Defendant would need to be held down for the blood draw, because he was refusing to cooperate, despite the search warrant. Smith and Kallay placed Defendant in handcuffs and placed him on his stomach. Because Defendant was "somewhat combative and did not want his blood drawn," two nurses assisted the officers in holding Defendant down, and a nurse was able to draw Defendant's blood.

Defendant testified that he did not refuse to provide a blood sample but was only asking to see the search warrant. He also testified that a doctor and a nurse were in the hospital room with him when his blood was collected. He said, "They forced me to the table. Not forced. They asked me to lay down." He also testified that unknown persons got on top of him, forced his head into a pillow, and forcibly drew his blood.

A chemical analysis of Defendant's blood by technicians at the North Carolina State Crime Laboratory revealed a blood alcohol concentration of 0.07 and the presence of the following substances: cannabinoids (specifically the substances tetrahydrocannabinol ("THC") and tetrahydrocannabinol carboxylic acid ("THCA")), amphetamine, and methamphetamine.

### III. Issues Presented

Defendant presents the following issues on appeal: (1) the trial court erred by denying his motion to dismiss for insufficient evidence of each offense; (2) the trial court erred by denying his motion to suppress the results of the blood test; (3) the trial court abused its discretion by allowing into evidence the vodka bottle that police officers had emptied at the scene of the arrest; and (4) the trial court erred in determining that the officers' "intentional suppression" of body-camera recording evidence did not violate Defendant's constitutional rights.

## IV. Discussion

### *A. Motion to Dismiss*

Defendant first argues that the trial court erred by denying his motion to dismiss for insufficient evidence of each charge.

Upon a motion to dismiss for insufficient evidence, the trial court must determine whether the State presented "substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense." *State v. Lynch*, 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Worley*, 198 N.C. App. 329, 333, 679 S.E.2d 857, 861 (2009) (internal quotation marks and citation omitted). The trial court must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *State v. Fritsch*, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455 (2000). This Court reviews a trial court's denial of a motion to dismiss de novo. *State v. Moore*, 240 N.C. App. 465, 470, 770 S.E.2d 131, 136 (2015) (citation omitted).

1. Driving While Impaired

Defendant argues that the trial court erred by denying his motion to dismiss the DWI charge, because the State failed to present sufficient evidence that Defendant drove a vehicle and was impaired.

Under N.C. Gen. Stat. § 20-138.1(a):

> A person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State:
>
>> (1)　While under the influence of an impairing substance; or
>>
>> (2)　After having consumed sufficient alcohol that he has, at any relevant time after the driving, an alcohol concentration of 0.08 or more.　The results of a chemical analysis shall be deemed sufficient evidence to prove a person's alcohol concentration; or
>>
>> (3)　With any amount of a Schedule I controlled substance, as listed in [N.C. Gen. Stat. §] 90-89, or its metabolites in his blood or urine.

N.C. Gen. Stat. § 20-138.1(a) (2018).

A person "drives" within the meaning of the statute if he is "in actual physical control of a vehicle which is in motion or which has the engine running." N.C. Gen. Stat. § 20-4.01(7) and (25) (2018) (noting that the terms "operator" and "driver" are synonymous). *See State v. Fields*, 77 N.C. App. 404, 406, 335 S.E.2d 69, 70 (1985) (holding that defendant sitting behind the wheel of a car in the driver's seat with the engine running drove within the meaning of the statute, even though defendant claimed that the car was running only to heat the car). An individual who is asleep behind the wheel of a car with the engine running is in actual physical control of the car, thus driving the car within the meaning of the statute. *State v. Mabe*, 85 N.C. App. 500, 504, 355 S.E.2d 186, 188 (1987).

In this case, when Richard responded to a call reporting a stationary vehicle on the road, he found Defendant in the driver's seat of the vehicle with the headlights on and the engine running. Initially, Defendant appeared to be asleep. When Richard was able to engage Defendant in conversation, Defendant asked if he could pull his car forward and repeatedly revved the engine. No other passengers were in the car. When Richard asked Defendant to exit the car, Defendant exited from the driver's side. This evidence was sufficient to establish that Defendant drove the car within the meaning of the statute. *See Fields*, 77 N.C. App. at 406, 335 S.E.2d at 70; *Mabe*, 85 N.C. App. at 504, 355 S.E.2d at 188.

Defendant also argues that the State did not provide sufficient evidence that he was impaired, because his blood alcohol concentration was less than 0.08, and he only failed the horizontal gaze nystagmus test due to a medical problem.

The acts of driving while under the influence of an impairing substance, driving with a blood alcohol concentration of 0.08, and driving with a controlled substance or its metabolites in one's blood or urine are three "separate, independent[,] and distinct ways by which one can commit the single offense of [DWI]." *State v. Coker*, 312 N.C. 432, 440, 323 S.E.2d 343, 349 (1984) (emphasis omitted). The trial court only instructed the jury on the driving while under the influence of an impairing substance prong. Thus, the State need not have presented evidence that Defendant

had a blood alcohol concentration of 0.08 or above in order to have presented sufficient evidence of DWI. *See id.*

"The opinion of a law enforcement officer . . . has consistently been held sufficient evidence of impairment, provided that it is not solely based on the odor of alcohol." *State v. Mark*, 154 N.C. App. 341, 346, 571 S.E.2d 867, 871 (2002) (citations omitted). Additionally, a defendant's blood alcohol concentration or the presence of any other impairing substance in the defendant's body, as shown by a chemical analysis, and a defendant's refusal to submit to an intoxilyzer test are admissible as substantive evidence of impairment. *See* N.C. Gen. Stat. § 20-139.1(a) (2018) (chemical analysis); N.C. Gen. Stat. § 20-139.1(f) (2018) (intoxilyzer refusal). An impairing substance is defined as alcohol, a controlled substance, "any other drug or psychoactive substance capable of impairing a person's physical or mental faculties," or any combination of these substances. N.C. Gen. Stat. § 20-4.01(14a) (2018). Amphetamine, methamphetamine, marijuana, and tetrahydrocannabinols are controlled substances, *see* N.C. Gen. Stat. §§ 90-89, 90-94 (2018), and are thus impairing substances within the meaning of the statute.

Here, Richard testified that he found Defendant slumped over and apparently sleeping in the driver's seat. Richard, Smith, and Torres detected a strong odor of alcohol on Defendant's breath and observed that Defendant's speech was slurred and that his eyes were red, watery, glassy, and bloodshot. Richard and Torres saw an

alcohol bottle between Defendant's legs. Defendant was confused and disoriented, and he admitted that he had consumed alcohol. Smith observed that Defendant's movements were labored. Smith conducted horizontal and vertical nystagmus tests, which Defendant failed. Smith testified that Defendant mentioned having eye trouble but also displayed erratic behavior, leading Smith to believe that Defendant was impaired. Because the officers' opinions that Defendant was impaired were not based solely on the odor of alcohol, they were sufficient evidence of impairment. *See Mark*, 154 N.C. App. at 346, 571 S.E.2d at 871.

Additionally, the State presented a chemical analysis of Defendant's blood, which indicated that it contained alcohol, THC, THCA, amphetamine, and methamphetamine. This was sufficient evidence of impairment. *See* N.C. Gen. Stat. § 20-139.1(a). Moreover, the State also presented evidence that Defendant refused to submit to an intoxilyzer test, which was also sufficient evidence of impairment. *See* N.C. Gen. Stat. § 20-139.1(f).

Viewed in the light most favorable to the State, this evidence was sufficient to support the conclusion that Defendant was "under the influence of an impairing substance" at the time of the arrest. *See* N.C. Gen. Stat. § 20-138.1(a)(1). Because the State presented sufficient evidence of each element of the DWI offense, the trial court properly denied Defendant's motion to dismiss.

2. <u>Resisting a Public Officer</u>

Defendant next argues that the trial court erred by denying his motion to dismiss the charge of resisting a public officer for insufficient evidence. Defendant contends that any negative interactions he had with the police were due to his confusion and pain at the time of his arrest.

"If any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of" the offense of resisting a public officer. N.C. Gen. Stat. § 14-223 (2018). "The conduct proscribed under [N.C. Gen. Stat. §] 14-223 is not limited to resisting an arrest but includes any resistance, delay, or obstruction of an officer in the discharge of his duties." *State v. Lynch*, 94 N.C. App. 330, 332, 380 S.E.2d 397, 398 (1989) (holding that defendant resisted officers by "continu[ing] to struggle after the officers apprehended him" for the purpose of identifying him). *See also State v. Burton*, 108 N.C. App. 219, 225, 423 S.E.2d 484, 488 (1992) (explaining that obstruction may be direct or indirect opposition or resistance to an officer lawfully discharging his duty, and holding that defendant resisted officers when he spoke in a "loud and hostile manner" while standing beside an officer's patrol car, because defendant's behavior interfered with the officer's attempt to use his radio to check the vehicle registration). The State "does not have to prove that the officer was permanently prevented from discharging his duties by defendant's conduct." *Id.*

In this case, Defendant impeded the officers' attempts to fulfill their duties at three different points. First, when Richard approached Defendant's car and asked Defendant to roll down his window so Richard could speak with him, Defendant refused. Defendant also attempted to start the car several times and revved the engine after Richard ordered him to stop. Defendant would not provide a breath sample when asked 10 to 12 times to do so. When Smith conducted the horizontal gaze nystagmus test, Defendant continued to place his hands in his pockets after being told several times to keep his hands down by his sides. Through these actions and his inaction, Defendant directly opposed the officers in their efforts to discharge their investigative duties of identifying him, speaking with him, and performing field sobriety tests. Thus, Defendant resisted the officers within the meaning of the statute, *see Lynch*, 94 N.C. App. at 332, 380 S.E.2d at 398, even though the officers were eventually able to fulfill their investigative duties, *see Burton*, 108 N.C. App. at 225, 423 S.E.2d at 488.

Defendant also resisted the officers while being arrested. Defendant "tensed up" and refused to cooperate when Smith tried to handcuff him, which required Smith, Richard, and Torres to work together to gain control of Defendant. Defendant then fell to the ground and started shouting and crying when the officers tried to move him to the patrol car. Defendant refused to place his legs inside the patrol car, so Torres had to grab Defendant's legs and put them inside the car in order to close

the door. Thus, Defendant also resisted, delayed, and obstructed officers in their efforts to place him under arrest and put him in the patrol car. *See Lynch*, 94 N.C. App. at 332, 380 S.E.2d at 398.

Finally, Defendant resisted, delayed, and obstructed officers at the hospital when they attempted to execute a search warrant to draw blood. Defendant refused to give a nurse permission to draw his blood, so Smith placed Defendant on his stomach while Defendant was handcuffed. Because Defendant was still resisting the blood draw and was combative, Smith, Kallay, and two nurses held Defendant down in order to collect a blood sample. Thus, Defendant also resisted, obstructed, and delayed officers in their efforts to execute the search warrant. *See id.*

Viewing the evidence in the light most favorable to the State, the State presented sufficient evidence that Defendant resisted, obstructed, and delayed public officers as they attempted to discharge their duties of investigation, arrest, and execution of a search warrant. Accordingly, the trial court did not err by denying Defendant's motion to dismiss this charge.

3. Possessing an Open Container

Defendant also argues that the trial court erred by denying his motion to dismiss for insufficient evidence the offense of possessing an open container, because Richard testified that the bottle did not have a significant amount of alcohol missing from it, and Smith admitted pouring out the bottle's contents.

"No person shall possess an alcoholic beverage other than in the unopened manufacturer's original container, or consume an alcoholic beverage, in the passenger area of a motor vehicle while the motor vehicle is on a highway or the right-of-way of a highway." N.C. Gen. Stat. § 20-138.7(a1) (2018). In *State v. Squirewell*, 256 N.C. App. 356, 808 S.E.2d 312 (2017), this Court affirmed the denial of a defendant's motion to dismiss for insufficient evidence of possessing an open container. The Court based its holding on the following:

> Besides the evidence that there was an open can of beer near the console area of the vehicle defendant was driving, which was visible to the state trooper upon his approach to the driver's side of the vehicle, the evidence also showed that defendant initially provided the state trooper a false name, defendant's eyes were red and glassy, there was a strong odor of alcohol coming from the vehicle, and defendant's speech was slurred. The state trooper further testified that he had defendant come back to his patrol car for further questioning. At that time, the trooper noticed an odor of alcohol on defendant's breath . . . .

*Id.* at 363, 808 S.E.2d at 318.

The evidence in this case is similarly sufficient. Richard and Torres testified that they saw an opened bottle of New Amsterdam vodka in between Defendant's legs while Defendant was seated in the driver's seat of a running car parked on Earl Street. The officers testified that the bottle contained liquid, which Smith poured out at the scene of the arrest. Richard testified that he found Defendant slumped over and apparently asleep in the driver's seat. Richard, Smith, and Torres detected a

strong odor of alcohol on Defendant's breath and observed that Defendant's speech was slurred and that his eyes were red, watery, glassy, and bloodshot. Smith observed that Defendant's movements were labored. Defendant was confused and disoriented, and he admitted that he had consumed alcohol.

Defendant argues that, because Richard testified that the bottle did not have a significant amount of alcohol missing when he found it, and Smith admitted pouring out the contents, that the State failed to present substantial evidence of the offense. However, the amount of alcohol missing from the container is irrelevant for purposes of this offense, because a container is opened "[i]f the seal on [the] container of alcoholic beverages has been broken." N.C. Gen. Stat. Section 20-138.7(f) (2018). Additionally, the fact that Smith poured out the contents of the container goes to the weight of the evidence, not its sufficiency.

Viewed in the light most favorable to the State, this was sufficient evidence that Defendant "possess[ed] an alcoholic beverage other than in the unopened manufacturer's original container." *See* N.C. Gen. Stat. § 20-138.7(a1). Accordingly, the trial court did not err by denying Defendant's motion to dismiss this offense.

### B. Motion to Suppress

Defendant next argues that the trial court erred by denying his motion to suppress the results of the blood test.

As a threshold issue, the State argues that Defendant failed to preserve this issue for appellate review, because Defendant failed to move for suppression prior to trial. Although Defendant did not move for suppression prior to trial, the trial court, in its discretion, heard the motion and denied it on its merits. Defendant's argument is thus properly before us. *See State v. Detter*, 298 N.C. 604, 619, 260 S.E.2d 567, 579 (1979) (reviewing a constitutional question presented in defendant's motions to suppress despite their untimeliness, because the trial court considered and overruled them on their merits).

This Court reviews a trial court's ruling on a motion to suppress to determine whether the "underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the . . . ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). We review a trial court's conclusions of law de novo. *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011).

1. Officers' Use of Force

Defendant first argues that the trial court erred by denying his motion to suppress the results of the blood test, because Defendant's blood was drawn by excessive and unreasonable force, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

In its written order denying the motion to suppress, the trial court included 72 paragraphs of interspersed findings of fact and conclusions of law. Findings relevant to the force used in connection with obtaining Defendant's blood sample include:

> 3. Officer Smith asked [Defendant] 10-12 times to blow into the alcosensor device.
>
> 4. [Defendant] never provided a sample for the portable breath test.
>
> 5. When officers attempted to handcuff [Defendant], he tensed up and the officers forced him onto the hood of a patrol vehicle.
>
> 6. [Defendant] was placed in handcuffs and put into a patrol car.
>
> 7. [Defendant] started screaming after he was handcuffed. Once the handcuffs were adjusted, he stopped screaming.
>
> 8. [Defendant] was transported to the law enforcement annex for an intoxilyzer test.
>
> 9. After being advised of his rights, [Defendant] refused to sign the rights form.
>
> 10. [Defendant] did not provide a breath sample. He never put his mouth on the tube or attempted to blow into the machine.
>
> 11. After asking [Defendant] multiple times to provide a breath sample, [O]fficer Smith recorded the result of the intoxilyzer test as a "Refusal."
>
> 12. Smith then prepared an application for a search warrant to take a blood sample from [Defendant].
>
> 13. After the magistrate issued the search warrant, Smith took [Defendant] to the hospital in order to obtain the blood sample.
>
> 14. At the emergency room, Smith advised the charge nurse that he had a search warrant for a blood sample.
>
> 15. Smith also advised [Defendant] that he had a search

warrant to take a blood sample.

16. Officer Smith read the search warrant to [Defendant].

17. Officer Smith did not indicate whether he gave [Defendant] a copy of the search warrant.

18. Officer Smith took [Defendant] to a room in the emergency room and they waited for a nurse.

19. Smith indicated that a nurse came to perform the blood draw.

20. [Defendant] also indicated that a nurse was in the room.

21. Smith observed the blood draw and the nurse signed on the rights form.

22. Officer Smith did not recall the name of the nurse and he could not read the signature on the rights form.

23. Hospital personnel obtained an EKG from [Defendant] prior to taking the blood sample to check on his medical condition.

24. The nurse asked [Defendant] if he minded if she took his blood and [Defendant] replied that she could not have his blood.

25. [Defendant] advised the nurse that she could not take his blood.

26. [Defendant] tensed up and told the nurse that she was not going to take his blood.

27. [Defendant] was handcuffed as he sat on a bed in the room waiting to have his blood drawn.

28. [Defendant] was combative and would not allow his blood to be drawn.

29. [Defendant] testified that he would not agree for his blood to be taken without a search warrant.

30. [Defendant] testified that he was never given a copy of the search warrant.

31. [Defendant] testified that he did not object to giving a blood sample and that he was willing to provide the

sample. The Court does not find these statements to be credible.

32. The officers pinned [Defendant] to the bed in order to take his blood.

33. [Defendant] in this case does not challenge the validity of the search warrant to take samples of his blood. Instead, [Defendant] challenged the use of force to take these samples despite [Defendant's] resistance to the execution of the search warrant.

Defendant argues that findings of fact 16 and 21 are not supported by competent evidence.[1] We disagree. Smith's testimony indicating that he read the search warrant to Defendant at the hospital and that Smith was present and aware that a nurse was drawing Defendant's blood provide competent evidence to support both findings of fact. The remaining, unchallenged findings of fact are binding on appeal. *State v. Taylor*, 178 N.C. App. 395, 412-13, 632 S.E.2d 218, 230 (2006) (citation omitted).

Defendant also argues that that the findings of fact do not support the trial court's conclusion of law 57: "The force used to execute the search warrant in this instance was not unreasonable under the Fourth Amendment."

*Schmerber v. California*, 384 U.S. 757 (1966), is the seminal case involving the forced extraction of blood from an accused. In *Schmerber*, the Court held that blood

---

[1] Defendant also argues that "[t]he trial court's findings and conclusions in Paragraphs 34 through 45 of its Order are not supported by competent evidence, and the findings fail to support the court's legal conclusions." However, Paragraphs 34 through 45 contain no findings of fact, but consist mainly of recitation of legal rules from applicable case law.

alcohol evidence could be taken without a driving-under-the-influence suspect's consent and without a warrant when probable cause and exigent circumstances existed, e.g., rapid elimination of blood alcohol content by natural bodily functions. *Id.* at 770-771. However, the *Schmerber* Court emphasized that a blood draw remains subject to Fourth Amendment standards of reasonableness. *Id.* at 768. Specifically, the procedure must be conducted without unreasonable force and in a medically acceptable manner. *Id.* at 771.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Court clarified that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (citation omitted). "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,'" *id.* (citation omitted), its application

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Courts have likewise analyzed claims of excessive force in effectuating a blood draw under a reasonableness standard. *See Schmerber*, 384 U.S. at 768.

Defendant cites no published North Carolina case law analyzing an officer's use of force in effectuating a search warrant to draw a defendant's blood, and our research reveals none.[2] The trial court relied upon *United States v. Bullock*, 71 F.3d 171 (5th Cir. 1995), wherein that court considered whether the force used during a blood draw authorized by a search warrant was excessive. In *Bullock*,

> the FBI obtained a search warrant to obtain samples of [the defendant's] blood and hair for DNA and other analysis. [The defendant] refused to comply with the warrant, so a seven member "control team" was used to subdue him and get the blood and hair samples. [The defendant] was cuffed and shackled between two cots that were strapped together. He physically resisted by kicking, hitting and attempting to bite the agents. A towel was placed on [the defendant's] face because he was spitting on the agents. A registered nurse took blood from [the defendant's] hand and then combed and plucked twenty hair samples from his scalp.

*Id.* at 174.

---

[2] In an unpublished opinion, this Court determined that the findings of fact supported the trial court's conclusion that the defendant's blood draw was performed pursuant to a valid search warrant, which was executed in a reasonable manner. *State v. Davis*, 243 N.C. App. 675, 779 S.E.2d 787 (2015).

The *Bullock* court concluded that "[t]he use of force in taking the samples was caused by [the defendant's] refusal to comply with a lawful warrant and was reasonable." *Id.* at 176. "When [the defendant] resisted the sample-taking, the agents used the force necessary to restrain him while samples were taken." *Id.* Noting that the defendant "had no right to resist execution of a search warrant [and i]n fact, his actions may even have risen to the level of criminal conduct [under] . . . 18 U.S.C. § 111 (assaulting or resisting a federal agent carrying out duties punishable by up to three years in prison)[,]" *id.* at 176 n.4, the court explained that the defendant "was given multiple opportunities to comply with the warrant; he was the one who decided that physical force would be necessary." *Id.* at 176. It was the defendant's "refusal to comply with a lawful warrant which forced the situation." *Id.* at 177. The court explained that a defendant "cannot resist a lawful warrant and be rewarded with the exclusion of evidence." *Id.*

In this case, the officers were authorized to require Defendant to provide a blood sample, because they possessed a valid search warrant. *See* N.C. Gen. Stat. § 15A-241 (2018) ("A search warrant is a court order and process directing a law-enforcement officer to search designated . . . persons for the purpose of seizing designated items and accounting for any items so obtained to the court which issued the warrant."). Defendant's blood was drawn by medical personnel, *see* § III.B.2., *infra*, in a hospital, which the U.S. Supreme Court has identified as a reasonable

manner in which to draw blood. *See Schmerber*, 384 U.S. at 771 (emphasizing the importance of defendant's health and safety by contrasting the described acceptable conditions—by medical personnel in a hospital—with unreasonable conditions that threaten "personal risk of infection and pain," such as police officers drawing blood in the privacy of a police station). Regarding the officers' use of force, we are persuaded by the reasoning in *Bullock* and conclude that the use of force in taking the blood sample in this case was caused by Defendant's refusal to comply with a lawful warrant and was reasonable.

Defendant admitted that he was initially asked to lie down so that his blood could be drawn. When Defendant refused and resisted the blood draw, the officers used the force necessary to restrain him while the sample was taken. Defendant had no right to resist execution of a search warrant and, in fact, his actions rose to the level of criminal conduct under N.C. Gen. Stat. § 14-223, for resisting a public officer. *See* § III.A.2., *supra.* As in *Bullock*, Defendant was given multiple opportunities to comply with the warrant, and it was his "refusal to comply with a lawful warrant which forced the situation." *See Bullock*, 71 F.3d at 177. Defendant "cannot resist a lawful warrant and be rewarded with the exclusion of evidence." *See id.*

In summary, the trial court's findings of fact support a conclusion that the officers' use of force was objectively reasonable in light of the facts and circumstances confronting the officers at the time they executed the search warrant. *See Graham*,

490 U.S. at 395-97. Therefore, the trial court's findings of fact support its legal conclusion that the force used to execute the search warrant was not unreasonable under the Fourth Amendment. Accordingly, the trial court did not err by denying Defendant's motion to suppress the results of the blood test on this ground.

2. Qualifications of Medical Professional

Defendant also argues that the trial court erred by denying his motion to suppress the results of the blood test, because the State did not meet its burden to demonstrate that the person who drew the blood was qualified.

When a law enforcement officer requires a blood test to be administered, "a physician, registered nurse, emergency medical technician, or other qualified person shall withdraw the blood sample." N.C. Gen. Stat. § 20-139.1(c) (2018). An officer's trial testimony regarding the qualifications of the person who withdrew the blood is sufficient evidence of the person's qualifications. *See, e.g., State v. Hinchman*, 192 N.C. App. 657, 663, 666 S.E.2d 199, 203 (2008) (holding that an officer's testimony that the person who drew defendant's blood worked in a restricted area in a blood lab and wore a lab technician's uniform was sufficient to establish qualification under the statute); *Richardson v. Hiatt*, 95 N.C. App. 196, 199, 381 S.E.2d 866, 868 (1989) (holding that an officer's testimony that a nurse authorized to draw blood in fact drew blood satisfied the State's burden to show qualification); *State v. Watts*, 72 N.C. App. 661, 664, 325 S.E.2d 505, 507 (1985) (holding that an officer's testimony that a blood

technician at a hospital drew the blood sample was sufficient to show that blood was drawn by a qualified person).

The trial court made the following relevant findings of fact:

> 14. At the emergency room, Smith advised the charge nurse that he had a search warrant for a blood sample.
>
> . . . .
>
> 18. Officer Smith took [Defendant] to a room in the emergency room and they waited for a nurse.
>
> 19. Smith indicated that a nurse came to perform the blood draw.
>
> 20. [Defendant] indicated a nurse was in the room.
>
> 21. Smith observed the blood draw and the nurse signed on the rights form.
>
> 22. Officer Smith did not recall the name of the nurse and he could not read the signature on the rights form.
>
> . . . .
>
> 24. The nurse asked [Defendant] if he minded if she took his blood and [Defendant] replied that she could not have his blood.
>
> 25. [Defendant] advised the nurse that she could not take his blood.
>
> . . . .
>
> 60. The individual who drew [D]efendant's blood was not identified by name and no evidence was offered to prove this individual's qualifications.

Defendant does not challenge any of these findings; they are thus binding upon us. *See Taylor*, 178 N.C. App. at 412-13, 632 S.E.2d at 230.[3]  These findings support the trial court's conclusion that that "[t]he evidence offered in this case was sufficient to prove that a qualified person drew [Defendant's] blood." *See, e.g., Hinchman*, 192 N.C. App. at 663, 666 S.E.2d at 203; *Richardson*, 95 N.C. App. at 199, 381 S.E.2d at 868; *Watts*, 72 N.C. App. at 664, 325 S.E.2d at 507.

As the State met its burden to demonstrate that the person who drew the blood was qualified within the meaning of N.C. Gen. Stat. § 20-139.1(c), the trial court did not err by denying Defendant's motion to suppress the results of the blood test on this ground.

## C. Admission of Evidence

Defendant next asserts that "[t]he trial court abused its discretion when it admitted into evidence, over [Defendant's] objection, a bottle purporting to have contained some quantity of vodka, which the State's officers admitted to destroying prior to [Defendant's] trial."

Defendant notes that "[a]t trial, the trial court overruled [Defendant's] objections to the admission of a vodka bottle found in a vehicle on the grounds that

---

[3] Defendant argues that "[t]he trial court's findings that 'a law enforcement officer testified that the sample was drawn by a blood technician at the hospital' and 'the only evidence before the trial court was that a nurse was present to withdraw the blood, and there was no evidence to the contrary,' were not supported by competent evidence."  Defendant's challenge is misguided as the trial court made no such findings; the challenged statements were portions of conclusions of law citing supporting authority.

the contents of the bottle had been destroyed and the chain-of-custody of the bottle had not been properly established."  Defendant's sole argument on appeal is that he is entitled to a new trial as a result of the trial court's admission of the bottle into evidence, because it was prejudicial, i.e., there was "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]"  *See State v. Hawk*, 236 N.C. App. 177, 180, 762 S.E.2d 883, 885 (2014) (internal quotation marks and citation omitted).

However, as we would only reach a prejudice analysis after determining that the admission of the evidence was erroneous, and Defendant cites no legal authority on appeal as to why the trial court's admission of the bottle into evidence was erroneous, Defendant's argument is thus deemed abandoned.  *See* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned. . . . The body of the argument . . . shall contain citations of the authorities upon which the appellant relies.").

*D. Officers' Use of Body Cameras*

In his final argument, Defendant presents the following issue on appeal:  "The trial court erred in its determination that the intentional suppression of body-camera recording evidence did not violate [Defendant's] rights under the Sixth and Fourteenth Amendments to the Constitution of the United States."  Citing *State v. Williams*, 362 N.C. 628, 669 S.E.2d 290 (2008), Defendant "respectfully requests that

the Court of Appeals dismiss the prosecution against him or, in the alternative, award him a new trial."

We first address the State's contention that this issue is not properly before us. The sole legal argument advanced on appeal is that "[t]he intentional decisions of Officers Richard and Smith not to employ their body cameras in a manner consistent with police policy . . . served to deny [Defendant] his due process rights under *Brady v. Maryland*[,]" 373 U.S. 83 (1963). Due process rights are Fourteenth Amendment rights. *See* U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."). As Defendant makes no Sixth Amendment argument on appeal, that portion of Defendant's issue is deemed abandoned. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned."); N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

Turning to Defendant's Fourteenth Amendment argument on appeal, Defendant has not preserved for appellate review any argument that the trial court erred by failing to dismiss the prosecution against him due to a *Brady* violation, because Defendant failed to move to dismiss the case for such a violation. In *Williams*, which Defendant cites in support of his argument, our Supreme Court affirmed the Court of Appeals, which had affirmed a trial court's order allowing the

defendant's motion to dismiss a criminal charge for prosecutorial misconduct under

N.C. Gen. Stat. § 15A-954(a)(4). *Williams*, 362 N.C. at 639-40, 669 S.E.2d at 298-99.

Pursuant to that section,

> The court on motion of the defendant must dismiss the charges stated in a criminal pleading if it determines that: . . . [t]he defendant's constitutional rights have been flagrantly violated and there is such irreparable prejudice to the defendant's preparation of his case that there is no remedy but to dismiss the prosecution.

N.C. Gen. Stat. § 15A-954(a)(4) (2018). In a pretrial hearing in *Williams*, the State

"admitted to the existence, possession, and destruction of material evidence favorable

to defendant and acknowledged that it was impossible to produce the evidence at that

time or, by implication, at any future trial." *Williams*, 362 N.C. at 629, 669 S.E.2d at

292. Based on these circumstances, the Court concluded that "the State flagrantly

violated defendant's constitutional rights and irreparably prejudiced the preparation

of his defense." *Id.* Accordingly, the Court found the requirements of N.C. Gen. Stat.

§ 15A-954(a)(4) satisfied and affirmed the order allowing the motion to dismiss. *Id.*

Unlike in *Williams*, Defendant in this case did not move to dismiss the charges

in the trial court pursuant to N.C. Gen. Stat. § 15A-954(a)(4). We are therefore

precluded from reviewing any denial of such motion, and Defendant's request that

this Court "dismiss the prosecution against him" is itself dismissed.[4]

---

[4] Defendant also argued at trial that he was entitled to a spoliation of the evidence instruction based on the officers' failure "to record the entire encounter." Defendant does not argue on appeal that

However, Defendant did argue at the suppression hearing that the officers' failure "to record the forcible withdrawal of blood [was] . . . a due process violation, and it's a violation of departmental policy." Defendant now argues on appeal that the officers' failure to record the encounter "served to deny [Defendant] his due process rights under *Brady v. Maryland*." We thus address whether the trial court erred by denying his motion to suppress, such that he may be entitled to a new trial, because Richard's and Smith's failure to employ their body cameras in a manner consistent with police policy denied Defendant his due process rights under *Brady*.

This Court reviews alleged violations of constitutional rights de novo. *State v. Graham*, 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009).

In *Brady*, the Supreme Court of the United States determined that the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires in state criminal cases "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Evidence favorable to an accused can be either impeachment evidence or exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is "material if there is a reasonable probability of a

the trial court erred in refusing to give this instruction, and it is therefore deemed abandoned. *See* N.C. R. App. P. 28.

different result had the evidence been disclosed." *State v. Berry*, 356 N.C. 490, 517, 573 S.E.2d 132, 149 (2002) (internal quotation marks and citation omitted).

First, we cannot conclude that the State "suppressed" the body-camera video, because the State never possessed it; it never existed. Under *Brady*, the State is required "to disclose only those matters in its possession." *State v. Thompson*, 187 N.C. App. 341, 353, 654 S.E.2d 486, 494 (2007) (internal quotation marks and citation omitted). Defendant essentially asks this Court to extend *Brady's* holding to include evidence not collected by an officer, which we decline to do.

Moreover, Defendant cannot show that video of the blood draw, if collected, would have been favorable to him; it may have corroborated the officers' testimony. Although the officers' failure to record the interaction violated departmental policy, such violation did not amount to a denial of Defendant's due process rights under *Brady* in this case. Accordingly, the trial court did not err in denying Defendant's motion to suppress.

## V. Conclusion

We conclude that the trial court did not (1) err by denying Defendant's motion to dismiss; (2) err by denying Defendant's motion to suppress; (3) abuse its discretion by admitting certain evidence; or (4) err in determining that law enforcement officers did not violate Defendant's constitutional rights.

AFFIRMED IN PART; NO ERROR IN PART.

Judges BERGER and ARROWOOD concur.